**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| THERESE CROWLEY, on her own behalf | ) | |
| and on behalf of all others similarly | ) | |
| situated, | ) | |
| Plaintiff, | ) | Case No |
| v. | ) | |
| WELLS FARGO BANK, N.A. | ) | |
| d/b/a WELLS FARGO HOME MORTGAGE | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

1. Plaintiff Therese Crowley brings this suit on behalf of herself and a class of similarly situated homeowners nationwide ("Plaintiffs" or "Class"), as well as a Subclass of Illinois homeowners ("Subclass"), to challenge Defendant Wells Fargo Bank, N.A.'s d/b/a Wells Fargo Home Mortgage ("Defendant" or "Wells Fargo") failure to honor its contractual obligations under its Home Affordable Mortgage Program Agreements ("HAMP Agreements") with its borrowers by not offering its borrowers loan modifications.

2. Under the Troubled Asset Relief Program ("TARP"), the United States Government loaned financial institutions nearly $700 billion in funds to address the current financial crisis. A key feature of TARP is the United States Treasury's Home Affordable Modification Program ("HAMP")—a program in which Wells Fargo received incentive payments for providing mortgage loan modifications programs and services to eligible borrowers, *See* United States Department of the Treasury, Citizens Report on TARP, *available at* URL http://www.financialstability.gov/ (follow "Citizens Report PDF" link) (last visited October 22, 2010).]

3. In or around April 2009, Wells Fargo Bank, N.A., accepted $25 billion in funds from the United States Government as part of TARP, 12 U.S.C. § 5211. Six months before accepting

this money, Wells Fargo Home Mortgage signed a contract with the U.S. Treasury agreeing to participate in HAMP.

4.  As a HAMP servicer, Wells Fargo offered to enter into loan modifications with Plaintiff and other eligible Wells Fargo borrowers. These HAMP Agreements, contained an express term requiring Wells Fargo to extend an application to the borrower which when submitted, would be evaluated by Wells Fargo according to the HAMP Agreement rules and guidelines with the intention of qualifying the borrower. Plaintiff, as well as, the members of the Class and Subclass, has complied with its contractual obligations under the HAMP Agreements by submitting all required documentation and answering all questions truthfully. Despite Plaintiff's and the other putative class members' full performance, Defendant Wells Fargo has ignored its contractual obligation to extend offers for loan modifications.

5.  While Defendant Wells Fargo enjoys $25 billion of taxpayer money through TARP, tens of thousands of Wells Fargo borrowers across the nation are being wrongfully deprived of an opportunity to modify their mortgages, cure their delinquencies and save their homes. Defendant's actions thwart the very purpose of HAMP and are a breach of its contracts.

## JURISDICTION

6.  Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This claim is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant.

7.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiff resides in this District. This Court has supplemental subject-matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

**PARTIES**

8. Plaintiff Therese Crowley is a natural person and a citizen of the state of Illinois. Plaintiff Crowley resides in Deerfield, Illinois.

9. Wells Fargo Bank, N.A. is a national banking association chartered in Sioux Falls, South Dakota and acts and operates as a mortgage lender with a principal place of business at 420 Montgomery Street, San Francisco, California 94104.

10. Wells Fargo Home Mortgage is an operating unit of Wells Fargo Bank, N.A. and is located in Des Moines, Iowa.

**FACTUAL BACKGROUND**

*Congressional Response to National Foreclosure Crisis*

11. Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default. Congressional Oversight Panel, Oct. 9, 2009 report at 3, *available at* URL http://cop.senate.gov/ reports/library/report-100909-cop.cfm. (last visited October 22, 2010). [Describing that neighborhoods suffer decreased property values and municipalities lose tax revenue as a result of foreclosures.]

12. On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and amended it on February 17, 2009, with the American Recovery and Reinvestment Act of 2009 (together, the "Act"). 12 U.S.C. § 5201 *et. seq.* (2009).

13. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

14. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset

Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

15. In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

16. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219.

17.  The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

18. The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C § 5220.

19. On February 18, 2009, pursuant to their authority under the Act, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.  It is this subprogram that is at issue in this case.

20. HAMP is funded by the federal government primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

21. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification and an additional $500 for modification of yet to be delinquent loans which were in clear danger of imminent default.

*Servicer Participation in the HAMP program*

22. The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Wells Fargo Home Mortgage (formerly Wachovia Mortgage FSB) is a servicer operated by Wells Fargo Bank, N.A., and its actions described herein were made as agents for the entities that hold mortgage loans.

23. To participate in HAMP, a servicer must execute a Servicer Participation Agreement ("SPA") with the federal government.

24. On April 13, 2009, Michael J. Heid of Wells Fargo Home Mortgage executed an SPA, thereby making Wells Fargo a participating servicer in HAMP.

25. The SPA executed by Mr. Heid incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers.

26. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." Those activities include without limitation, the proper hiring, training and supervision of the employees and representatives administering the HAMP Agreements program.

27. The Program Documentation requires that if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

*HAMP Applications*

28. As the first step in a HAMP loan modification, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower qualifies, offer the borrower a Trial Period Plan Agreement.

29. Wells Fargo's HAMP Agreements provide that Wells Fargo will accurately take the Borrower's information and process the application following all HAMP guidelines and rules in with the intention of qualifying the homeowner.

30. By failing to live up to its end of the HAMP Agreements and offer loan modifications as required, Wells Fargo has left homeowners with unaffordable mortgages and forced the homeowner to face foreclosure which is exactly what HAMP was designed to prevent.

## FACTS RELATING TO NAMED PLAINTIFF

31. On or about November 1, 2002, Crowley purchased her property at 1030 Chestnut Deerfield, Illinois 60015 (the "Property") for the purchase price of $270,000.

32. In order to finance the purchase price, Crowley took out a mortgage with Biltmore Financial Bancorp in the amount of $160,000. The monthly payment on the mortgage was $959.29, exclusive of real estate taxes and homeowner's insurance.

33. On or about May 19, 2005, Crowley refinanced the Property and took out a mortgage of $205,000 with Woodfield Planning Corporation.

34. On or about July 1, 2005, Woodfield Planning Corporation sent to Crowley a NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS naming Ohio Savings Bank as the servicer of the mortgage. The monthly payments on the mortgage were $989.32, exclusive of real estate taxes and homeowner's insurance.

35. On or about April, 2006, a second NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS was sent to Crowley naming Wells Fargo as the servicer of the mortgage. The monthly payments on the mortgage were $989.32 exclusive of real estate taxes and homeowner's insurance.

36. At the time of the Wells Fargo servicing agreement, the Property had an appraised value of $390,000. The loan to value ("LTV") at the time of the Wells Fargo loan was 52.5%.

37. During late 2008 – and early 2009, Crowley experienced financial difficulties owing to personal health problems related to serious surgeries she underwent. In addition, as a real estate broker of 14 plus years, she saw a substantial decrease in her income as that market began to deteriorate.

38. Owing to the aforementioned financial difficulties, in March of 2009, Crowley contacted Wells Fargo about her financial situation and her imminent danger of default. Crowley documented all of her communications with Wells Fargo. Emails and Correspondence between the parties have been preserved and Crowley kept contemporaneous notes with telephone communications with various employees of Wells Fargo.

39. During the course of her contact with Wells Fargo, Crowley specifically requested a loan modification under the Home Affordable Mortgage Program ("HAMP") that was being made available under a government program to address the current mortgage crisis.

40. Beginning in April 2009, Crowley began making requests to Wells Fargo for a HAMP application. In violation of the HAMP Agreement Guidelines requiring Wells Fargo to respond with an application within 10 days, Wells Fargo repeatedly told Crowley that they didn't have the forms and to call back. Crowley made repeated requests for a HAMP loan modification application from April 2009 until August of 2009 when she at long last was given the HAMP application.

41. On or about August 31, 2009, following the rules and guidelines set forth in the HAMP literature provided by Wells Fargo, Crowley submitted a HAMP application.

42. Crowley timely responded to and fully complied with all of Wells Fargo's follow up requests for additional information in order to process Crowley's application.

43. After two months of this information exchange, in a letter dated October 27, 2009, Wells Fargo denied Crowley's first HAMP loan modification application. Wells Fargo gave no specific reason for the denial in its letter of rejection and advised Crowley to seek a Short Sale or Deed in Lieu of Foreclosure.

44. On October 27, 2009, Crowley called Wells Fargo and spoke with Mark Johnson. In this conversation, Johnson stated that the denial of the loan modification was due to the Loan To Value/Net Present Value ("LTV/NPV") of the Property failed to meet the guidelines and that Crowley should seek to Short Sale the Property or grant a Deed in Lieu of Foreclosure. Johnson would not or could not explain the formulas by which the Property failed to meet the HAMP guidelines.

45. On November 5, 2009, Crowley reached an employee of Wells Fargo in the office of the President, Executive Mortgage Specialist Katie Nguyen. During this conversation, Nguyen stated at different times that a) the investor in Crowley's loan did not allow modifications (which was not true); b) that the LTV/NPV failure was related to Crowley's income (which was not true); and c) Crowley should resubmit all of her paperwork and in effect start the whole process over.

46. On November 13, 2009, Crowley submitted all of the Wells Fargo required documents via telefax. After follow up communications, Crowley again complied with and submitted all paperwork requested by Wells Fargo.

47. After this second round of paperwork, in a letter dated December 3, 2009, Crowley was again informed by Wells Fargo that her HAMP application was denied. Again, Wells Fargo gave

no specific reason for the denial in its letter and again advised Crowley to Short Sale the Property or enter into a Deed in Lieu of Foreclosure.

48. On December 16, 2009, Crowley spoke with Wells Fargo employee Anwar Rich who along with Adrian (a/k/a "employee BQ9") went through Crowley's data that was in the Wells Fargo system. That inquiry indicated that there were errors in the data entry concerning Crowley's financial work sheets. The Wells Fargo employees advised Crowley that in their opinion Crowley qualified for a HAMP loan modification. However, the two Wells Fargo employees had no recommended course of action for Crowley and would not properly resubmit the application with the corrected information.

49. On December 23, 2009, Crowley contacted the Wells Fargo Collections Department and spoke with Paula. After a review of the file, Paula determined that Wells Fargo had erroneously overstated Crowley's income by $2,800. Also, the file erroneously indicated Crowley owed $2,381.07 per month on a credit card debt which in fact had been paid off in 2002. Paula agreed that with the correct information  (information that Wells Fargo had during this entire process) in her opinion, Crowley qualified for a HAMP loan modification. Paula had no recommended course of action to give Crowley and Paula did not properly resubmit the application with the corrected information.

50. In a letter dated December 29, 2009, Wells Fargo acknowledged Crowley's complaint and asked her to gather information regarding her income.

51. On January 5, 2010, Wells Fargo employee Alea of the Loss Mitigation Department contacted Crowley to inquire if Crowley would Short Sale the Property. Crowley refused that request. In further conversation, Alea stated that the income indicated in Crowley's file (which was improperly overstated by Wells Fargo) disqualified Crowley for a HAMP loan modification.

52. In literature sent to Crowley dated January 4, 2010, Wells Fargo continued to push and advise Crowley to Short Sale the Property.

53. In January 2010, Crowley's attempts at seeking a correction of her file continued. Over the phone, Crowley was passed from Wells Fargo employee Mandy Fridly of Loss Mitigation to personnel in the Office of the President - Whitney and then on to Crystal Burke. On January 20, 2010, Crowley reached another Wells Fargo employee in the Office of the President, John Morgan, who advised Crowley to resubmit her financial information for a third time.

54. After more attempts to get Wells Fargo to act on her file, on February 10, 2010, Crowley reached another Wells Fargo employee – Executive Mortgage Specialist Robin Webb. In that conversation, Webb demanded that Crowley submit her financial information again before Webb would review Crowley's situation.

55. On February 16, 2010, Crowley forwarded her updated information via two day delivery to Wells Fargo c/o Webb.

56. On February 19, 2010 Crowley contacted Homeowners Help Hotline (a part of HUD) – and spoke with Yolanda Ruiz (ext 5219) and requested her assistance with Wells Fargo. Ruiz reviewed Crowley's financial information and expressed her opinion that Crowley qualified for a HAMP loan modification. Ruiz could only advise Crowley to go back to Wells Fargo.

57. In a letter dated March 10, 2010, Wells Fargo advised Crowley that her HAMP application had been denied – for the third time. Crowley contacted Webb the next day, March 11, 2010 and Webb advised Crowley that the letter was in error.

58. In a telephone conversation on March 15, 2010, Webb stated to Crowley that her HAMP application had been denied because of an income deficit. In a follow up letter dated March 16, 2010, Webb stated that Crowley had failed the HAMP income test of Wells Fargo by a deficit of $65.75 per month  Webb advised Crowley to enter into a Special Forbearance Agreement with Wells Fargo.

59. Crowley received the paperwork for a three month Special Forbearance Agreement and under duress, Crowley executed the same.

60. Crowley paid each of the three required monthly Special Forbearance Agreement payments of $491.16 on time and in full for the months of May, June and July of 2010. Crowley complied with all of the other terms and conditions of the Special Forbearance Agreement.

61. Throughout the time period of the Special Forbearance Agreement, Crowley was in frequent communication with Wells Fargo in pursuit of a HAMP loan modification.

62. After Crowley's Special Forbearance Agreement had expired July 31, 2010, Wells Fargo employee Tammy Johnson called Crowley on August 2, 2010 to offer new loan terms.

63. The terms of that Wells Fargo 'loan modification' required that, during the first 5 years, Crowley would be required to make monthly payments of $1063.38 exclusive of real estate taxes and homeowner's insurance. When Crowley first approached Wells Fargo in April 2009 seeking a loan modification, her monthly mortgage payment had been $989.32 exclusive of real estate taxes and homeowner's insurance.

64. Crowley spent the following few days in a futile effort to get a response from someone at Wells Fargo to Crowley's repeated requests for an explanation of how Wells Fargo had calculated the terms of the loan modification being quoted.

65. On August 12, 2010, Crowley contacted the Homeowner's Help Line and spoke with Vincent Silla. With Crowley on the line, Silla reached Phillip in the Wells Fargo Loan Servicing Group. Silla requested that Wells Fargo give a full written explanation to Crowley concerning the data input and calculations used to quote the loan terms to Crowley. Wells Fargo never complied with Silla's request.

66. In a letter dated August 29, 2010, Wells Fargo stated that they were withdrawing their offer of the mortgage requiring the aforesaid monthly payment of $1,063.38 because "...they were unable to reach her…." In fact Crowley had exchanged 39 emails with Wells Fargo in the month of August 2010 alone.

67. On September 9, 2010, Crowley contacted the Chicago office of Fannie Mae and spoke with Javier Vasquez. During that call, Vazquez looked in to the Fannie Mae computer system and

informed Crowley that her loan had been approved on August 2, 2010 for a loan modification that would require a monthly payment of $690.00 exclusive of real estate taxes and homeowner's insurance during the first 5 years.

68. On September 20, 2010, Crowley contacted the Wells Fargo Customer Service Department and was told that her file had been moved to the Short Sale Pre-Foreclosure department.

69. In a letter dated September 29, 2010, Wells Fargo informed Crowley that they were closing her file. To the date of this filing, Crowley hangs in limbo somewhere between loan modification and foreclosure.

70. The dizzying array of conflicting information Crowley was getting from Wells Fargo and the lack of transparency on the part of Wells Fargo made it impossible for Crowley to determine the accuracy of Wells Fargo's data input and compliance with HAMP guidelines for evaluating that financial information. One Wells Fargo employee would tell Crowley the rejection was on the basis of her income and another employee would tell Crowley that the reason for the denial was the Property failed the Net Present Value ("NPV") test. No Wells Fargo employee could tell Crowley what the NPV test was or how it was calculated.

71. Wells Fargo intentionally made the HAMP process obscure. In an email dated August 26, 2010, Webb, an employee of the Office of the President of Wells Fargo stated: "*As indicated, your income doesn't have anything to do with why you were actually denied for HAMP. You were denied for Net Present Value, at the time of the denial for NPV, we had been instructed to not use that as the reason because we were not prepared to explain Net Present Value denials.*"

72. Crowley has spent over 18 months and generated over 400 pages of correspondence attempting to get the HAMP loan modification for which she is qualified. Wells Fargo, rather than applying the HAMP guidelines, simply puts Crowley through an endless paperwork grinder.

73. Wells Fargo's only solution to Crowley was to advise Crowley to accept a Short Sale of the Property or a Deed in Lieu of Foreclosure.

74. At all relevant times during the 18 month paperwork grind directed by Wells Fargo, the loan to value on the Property ensured that Wells Fargo would get paid 100% of their outstanding debt in either a Short Sale or Deed in Lieu of Foreclosure proceeding; thus stripping Crowley of any remaining equity in her Property

75. Wells Fargo benefits by denying Crowley's application for a HAMP loan modification in that Wells Fargo can then force a sale or foreclosure on Crowley and get paid 100 cents on the dollar instead of the $500 HAMP Agreement fee.

76. A recent study shows that so called "service providers" like Wells Fargo make more money on a Foreclosure, Short Sale or Deed in Lieu transaction compared to the loan modification process. Wells Fargo has a financial incentive to ignore the HAMP guidelines and force a sale of Crowley's Property. [See National Consumer Law Center publication *"SERVICER COMPENSATION AND ITS CONSEQUENCES"* October 2009, URL http://www.nclc.org; enter publication title in site search.]

77. Crowley is a prime example of the type of situation that the HAMP programs were created to help. Wells Fargo has chosen to participate in the HAMP Program (deriving benefit from the U.S. Government); and at the same time Wells Fargo has chosen not to apply the HAMP guidelines in order to obtain the maximum amount of money out of the Property for its own benefit. The unintended consequence of this government program is that Crowley is forced down a path destined for failure and Wells Fargo improperly derives a benefit.

78. When Crowley originally approached Wells Fargo for a HAMP loan modification, Crowley had a monthly mortgage payment of $989.32. After 18 months and hundreds of exchanges of communications, Wells Fargo quoted a new loan payment of $1,063.38 per month. On the basis of Crowley's experience, Wells Fargo makes a mockery of the HAMP program while enjoying the largesse of the TARP payment that they have received.

## CLASS ALLEGATIONS

79.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

80.    This class action is brought by the Plaintiff on behalf of a nationwide Class and Illinois Subclass as defined as follows:

### Nationwide Class

All homeowners nationwide who have submitted a HAMP Application with Wells Fargo for the purposes of modifying their home mortgages and, despite having complied with all terms of the HAMP Agreement, have not had their applications processed with accurate information and fairly evaluated for a loan modification within the guidelines under the HAMP Agreements.

### Illinois Subclass

All homeowners in Illinois who have submitted a HAMP Application with Wells Fargo for the purposes of modifying their home mortgages and, despite having complied with all terms of the HAMP Agreement, have not had their applications processed with accurate information and fairly evaluated for a loan modification within the guidelines under the HAMP Agreements.

Excluded from the Class and Subclass is 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the class; and 4) the legal representatives, successors or assigns of any such excluded persons.

81.    Plaintiff sues on her own behalf and on behalf of the above-defined Class and Subclass under Rules 23(a) and (b) of the Federal Rules of Civil Procedure. Plaintiff does not know the exact size or identities of the members of the putative Class and Subclass, since such information is in the exclusive control of Defendant. Plaintiff believes that the Class and Subclass encompass

hundreds of individuals whose identities can be readily determined from Defendant's books and records. Therefore, the proposed classes are so numerous that joinder of all members is impracticable.

82.     Based on the size of the modifications at issue, Plaintiff believes the amount in controversy exceeds $5 million.

83.     All members of the Class and Subclass have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the Class and Subclass that are subject to common proof and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

a.   Whether the HAMP Agreements confer third party beneficiary status on applicants for HAMP Agreement loan modifications.

b.   Whether Wells Fargo HAMP Agreements required Wells Fargo to timely and accurately process a loan modification application under HAMP in an effort to qualify the applicant for a HAMP loan modification.

c.   Whether the HAMP Agreements required Wells Fargo to make transparent its HAMP loan modification financial analysis to make that process open to a review for accuracy of financial information provided and adherence to HAMP guidelines.

d.   Whether Wells Fargo breached an express term of its HAMP Agreements in failing to timely and accurately process a loan modification application under HAMP Agreements.

e.   Whether Wells Fargo breached an implied covenant of good faith and fair dealing by continually requesting information from the loan modification applicant that Wells Fargo already had in its files and by taking other steps to intentionally disqualify the applicant.

f.   Whether Wells Fargo breached an implied covenant of good faith and fair dealing by intentionally misstating the reason for the denial of a HAMP loan modification application.

g. Whether Wells Fargo breached its duty by not properly hiring, training and supervising its employees and representatives administering the HAMP Agreement program.

h. Whether Plaintiff and Class members reasonably relied on material representations of Wells Fargo related to the offer of loan modifications and whether the Plaintiff and Class suffered because of their reasonable reliance.

i. Whether the Court can order damages, and the amount of such damages.

j. Whether the Plaintiff and Class are entitled to injunctive relief.

84. The claims of the individual named Plaintiff are typical of the claims of the Class and Subclass and do not conflict with the interests of any other members of the Class and Subclass in that both the Plaintiff and the other members of the Class and Subclass were subject to the same conduct, made the same application, and were met with the same wrongful loan modification application evaluation by Defendant.

85. The individually named Plaintiff will fairly and adequately represent the interests of the Class and Subclass. Plaintiff is committed to the vigorous prosecution of the Class's and Subclass's claims and has retained attorneys who are qualified to pursue this litigation.

86. A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

87. This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

88. The Defendant has acted or refused to act on grounds that apply generally to the Class and Subclass so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class and Subclass as a whole.

**COUNT I**

**<u>Breach of Contract</u>**

(on behalf of the Class)

89.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

90.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Nationwide Class described above.

91.    As described above, the HAMP Agreements executed by the Defendant conferred certain rights upon the Class with regard to HAMP loan modification applications.

92.    The HAMP Agreement  provided that if the Plaintiff and the members of the Class made a loan modification application under HAMP, Wells Fargo would process and evaluate that application within the guidelines and rules set forth in the HAMP Agreements.

93.    Plaintiff and the members of the Class made their application to Defendant and complied with all requests for information accurately and truthfully and took all such other steps necessary under the HAMP Agreements.

94.    Rather than accurately inputting information supplied by Plaintiff and members of the Class and seeking to qualify the applicant, Defendant intentionally and systematically input wrong information into the evaluations in order to disqualify the applicant.

95.    Wells Fargo intentionally made false and misleading statements regarding the applications in order to prevent members of the class from qualifying under the HAMP program.

96.    Wells Fargo failed to implement adequate procedures and systems to respond to inquiries and complaints, and by otherwise dragging out and delaying its offers for loan modifications.

97.     Rather than extend offers for modification to Plaintiff and the Class members, Defendant, without justification, gave the Plaintiff only the option of giving up their house through a Short Sale, Deed in Lieu of Foreclosure or face an outright Foreclosure.

98.     Wells Fargo breached its duty because it:

a)  failed to perform loan servicing functions consistent with it's responsibilities to Plaintiff and the Class;

b)  failed to properly hire, train and supervise its agents and employees including, without limitation, its HAMP program administration personnel;

c)  improperly denied HAMP applications on false information;

d)  intentionally stated false reasons for denying a HAMP application, thus adversely affecting an applicant's right to reapply.

e)  failed to process loan modification applications with accuracy;

f)  failed to seek to qualify the applicant within the HAMP guidelines;

g)  improperly, intentionally and systematically made repeated requests for documents already in its possession;

h)  improperly and repeatedly inputted inaccurate and detrimental financial information into the applicant's analysis;

i)  failed to implement adequate procedures and systems to respond to inquiries and complaints; and

d)  ultimately, without justification, ignored the HAMP Agreement guidelines and policies and engaged in a system that seeks to reject applications.

99.     As an actual and proximate result of Wells Fargo's breaches of these contractual terms, Plaintiff and the Class members have suffered harm and are threatened with additional harm from Defendant's breach. Plaintiff and the Class members have been denied offers for loan modifications for which they are qualified.

100.    On information and belief, some putative Class members have suffered additional harm and expense in the form of defending against foreclosure activity against their homes when, in

reality, they should been offered loan modifications that would allow them to maintain their mortgages in good standing and avoid losing their homes. Others have already lost their homes.

## COUNT II

### Breach of the Implied Covenant of Good Faith and Fair Dealing

(on behalf of the Subclass)

101.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

102.    Plaintiff brings this claim on her own behalf and on behalf of each member of the Illinois Subclass described above.

103.    Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

104.    The purpose of the covenant of good faith and fair dealing is to guarantee that the parties remain committed to the intended and agreed-upon expectations of the parties in their performance.

105.    Wells Fargo breached the implied covenant of good faith and fair dealing because it:

   a) failed to perform loan servicing functions consistent with it's responsibilities to Plaintiff and the Class;

   b) failed to properly hire, train and supervise its agents and employees including, without limitation, its HAMP program administration personnel;

   c) improperly denied HAMP applications on false information;

   d) intentionally stated false reasons for denying a HAMP application, thus adversely affecting an applicant's right to reapply.

   e) failed to process loan modification applications with accuracy;

   f) failed to seek to qualify the applicant within the HAMP guidelines;

   g) improperly, intentionally and systematically made repeated requests for documents already in its possession;

   h) improperly and repeatedly inputted inaccurate and detrimental financial information

into the applicant's analysis;

i) failed to implement adequate procedures and systems to respond to inquiries and complaints; and

j) ultimately, without justification, ignored the HAMP Agreement guidelines and policies and engaged in a system that seeks to reject applications.

106. On information and belief, Defendant engaged in the conduct as alleged in Paragraph 105 above, in a deliberate attempt to disqualify applicants for loan modifications and to minimize the total number of loan modifications ultimately extended.

107. As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiff harm.

### COUNT III
### VIOLATIONS OF THE CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT
### <u>815 ILCS § 505/2 (UNLAWFUL PRACTICES)</u>
(on behalf of the Subclass)

108. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

109. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") declares unlawful "any [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."

110. Section 2 of the CFA also prohibits commercial unfairness, where the challenged practice offends public policy; is immoral, unethical, oppressive, or unscrupulous; or causes substantial injury to consumers.

111. At all material times, as set forth herein, Defendant Wells Fargo violated the CFA

because it:

    a. failed to perform loan servicing functions consistent with its responsibilities to Plaintiff and the Class;

    b. failed to properly hire, train and supervise its agents and employees including, without limitation, its HAMP program administration personnel;

    c. improperly denied HAMP applications on false information;

    d. intentionally stated false reasons for denying a HAMP application, thus adversely affecting an applicant's right to reapply.

    e. failed to process loan modification applications with accuracy;

    f. failed to seek to qualify the applicant within the HAMP guidelines;

    g. improperly, intentionally and systematically made repeated requests for documents already in its possession;

    h. improperly and repeatedly inputted inaccurate and detrimental financial information into the applicant's analysis;

    i. failed to implement adequate procedures and systems to respond to inquiries and complaints; and

    j. ultimately, without justification, ignored the HAMP Agreement guidelines and policies and engaged in a system that seeks to reject applications.

112.    Wells Fargo never intended to offer the loan modifications consistent with HAMP and with their SPA.  In short, rather than providing loan modifications to individuals who were the intended beneficiaries of HAMP, Wells Fargo mislead, deceived and damaged the Plaintiff by creating a false sense of assistance and security and all the while maneuvering to force the Plaintiff to lose its property through a short sale, deed in lieu of foreclosure and/or a foreclosure and for the benefit of the Defendant.

113.    By committing the acts alleged above, Wells Fargo violated §2 of the CFA by engaging in unfair and/or deceptive practices, including, but not limited to, the misrepresentation, concealment, suppression, or omission of material facts, while participating in trade or commerce with the knowledge and/or intent that the Plaintiff and others would rely on their deceptive conduct.

## COUNT IV
## <u>PROMISSORY ESTOPPEL, IN THE ALTERNATIVE</u>
### (on behalf of the Class)

114.     Plaintiff repeats and re-alleges paragraphs 1 through 89, 101 and 108 above as and for paragraph 114 of this Count III.

115.     Plaintiff brings this claim in the alternative to Counts I, II and III, on her own behalf and on behalf of each member of the Class described above.

116.     Plaintiff brings this claim on her own behalf and on behalf of each member of the Class described above.

117.     Defendant, by way of its HAMP Agreements, represented to Plaintiff that if she executed and returned the HAMP Agreement to Wells Fargo along with supporting documentation, she would be fairly evaluated for a loan modification applying the HAMP guidelines.

118.     Over the course of 18 months and 400 pages of documented communications, Plaintiff did comply with Wells Fargo's requests for all necessary documentation.

119.     As Wells Fargo was a signatory to the SPA and HAMP Agreements, Plaintiff's reliance was reasonable.

120.     Plaintiff's reliance was to her detriment. When Plaintiff started the first two rounds of loan modification applications, although Plaintiff was in imminent danger of default on the mortgage, Plaintiff was current on her mortgage and had a credit score of 790. Plaintiff has yet to receive an offer for a loan modification consistent with the HAMP guidelines and has lost the opportunity to fund other strategies to deal with her mortgage issues.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests the following relief:

A. Certify this case as a class action and appoint the named Plaintiff to be class representative and her counsel to be class counsel;

B. Enter a judgment declaring the acts and practices of Defendant complained of herein do constitute breaches of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer loan modifications to class members;

C. Declare that Wells Fargo's conduct as described above constitutes unfair and/or deceptive acts or practices within the meaning of § 2 of the Illinois Consumer Fraud Act.

D. Permanently enjoin Wells Fargo and its employees, officers, directors, agents, successors, assigns, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and any and all persons acting in concert or participation with Wells Fargo from continuing the unlawful conduct, acts, and practices described above;

E. Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class and Subclass;

F. Order Defendant to adopt and enforce a policy that requires appropriate hiring, training and supervision of its employees and agents regarding their duties under the HAMP Agreements;

G. Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

H.  Award actual and punitive damages to the Plaintiff and the Class and Subclass;

I.   Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

J.   Award penalties for each violation found by the Court to have been committed by Wells Fargo with the intent to defraud in the amount of actual damages as this court may deem just and pursuant to 815 ILCS § 505/10(a); and

K.  Grant Plaintiff and the Class and Subclass such other and further relief as this Court finds necessary and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  November 8, 2010

Respectfully submitted,

**Therese Crowley**
<u>By: /s/ Bernard J. Conway</u>
Attorney at Law
100 East Walton #600
Chicago, Illinois 60611
Plaintiff's Counsel

**Law Office of Bernard J. Conway**
Bernard J Conway ARDC#6194926
100 East Walton #600
Chicago, Illinois 60611
bjcireland@gmail.com
Fax: 312-867-0800
Phone 312-235-2052